[No. 22786. Department One. February 26, 1931.]

H. C. JOHNSON, *as Supervisor of Banking, et al., Appellants*, v. CALIFORNIA-WASHINGTON TIMBER COMPANY, *Respondent.*

CALIFORNIA-WASHINGTON TIMBER COMPANY, *Respondent*, v. H. C. JOHNSON, *as Supervisor of Banking, et al., Appellants.*[1]

*Eggerman & Rosling, Lund & Dodds,* and *Arthur G. Cohen,* for appellants.

*Theodore B. Bruener* and *John C. Hogan,* for respondent.

HOLCOMB, J.—Two consolidated actions are before us on this appeal, one originally by the supervisor of

[1]Reported in 296 Pac. 159.

banking and his special deputy, the liquidator of Hayes & Hayes Bank, an insolvent banking corporation, against California-Washington Timber Company, a corporation, and the other by the California-Washington Timber Company, a corporation, against the supervisor of banking and his special deputy supervisor, as liquidator of the above named insolvent banking corporation.

The facts are not greatly in conflict in this record, and, when any conflict exists, there is ample evidentiary support for the findings made by the trial court, and, as to findings denied, the trial court simply refused to put the construction upon certain facts requested by appellants.

When Hayes & Hayes Bank, of Aberdeen, failed, California-Washington Timber Company was a depositor, and its general claim was subsequently allowed. After the first dividend was paid, the liquidator of the bank refused to pay the Timber Company any further dividends, whereupon it filed suit against the liquidator to recover judgment for such dividends as had been declared and were unpaid. The liquidator answered by admitting his liability for the dividends, but claiming that the Timber Company had become indebted to him, and that this indebtedness was a proper offset to his liability for the dividends declared.

A logging contract had been entered into between Humptulips Logging Company (which will hereafter be merely called the "Logging Company") and the Timber Company, on March 1, 1920. The contract is very full and complete, and much too lengthy to set forth herein. It has been carefully examined. By the terms of the contract entered into, the Logging Company undertook to log certain timber lands of the

Timber Company. The Logging Company was given exclusive power of sale of the logs, and was required to deposit the proceeds of the sale in the Hayes & Hayes Bank, to the credit of a fund specially designated "Humptulips Logging Company-California-Washington Timber Company fund," to identify it with this contract.

The contract further provided that, out of this fund, there should be paid, first, to the Timber Company, the sum of three dollars per thousand feet, selling scale, on all logs sold; second, to the Logging Company, the actual cost of logging the timber per thousand feet; third, to the Logging Company, a profit of two dollars per thousand feet on the logs sold; and, fourth, any excess remaining after above payments to be paid to the Timber Company. As there never was any surplus over and above the three dollars, the cost of logging, and the two dollars profit on the timber sold, we are not concerned with any excess to be paid to the Timber Company.

When the bank closed on February 7, 1927, the Timber Company had a general deposit in the bank aggregating $12,737.20 and a certificate of deposit for $1,863.50. There was also on deposit in the joint account above mentioned, the sum of $1,599.93. This joint account represented the proceeds of the sale of 388,353 feet of logs, which brought $4,864.36. The three dollars per thousand upon that quantity of logs, the Timber Company's share, amounted to $1,165.06, and the balance was the share of the Logging Company. Shortly before the bank closed, the Logging Company withdrew, on two occasions, a total of $3,-264.43, leaving a balance in the account of $1,599.93, of which $1,065.06, or 72.84 per cent, was the share of the Timber Company, and $434.87, or 27.16 per cent, was the share of the Logging Company.

On January 25, 1925, the Logging Company had completed its logging operations under the contract, although on December 8, 1926, approximately two million feet remained in the river and in the boom. For several years prior to December 8, 1926, the rafts of logs were being sold to the Aberdeen Lumber & Shingle Company, and it was the custom of that company to make out its check for the purchase price to the Timber Company. On December 8, the Logging Company, pursuant to its power of sale, sold the balance of the logs, estimated at two million feet, to the Aberdeen Lumber & Shingle Company, which company made an advance payment on account of the purchase price of $20,000. A receipt was taken which read in part as follows:

"Aberdeen, Washington,
December 8th, 1926.

"The California-Washington Timber Company, a corporation of the state of Washington, hereby acknowledges receipt from the Aberdeen Lumber & Shingle Company of the sum of Twenty Thousand Dollars ($20,000.00) as an advance payment on Two Million Feet (2,000,000') B. M., log scale, of saw logs belonging to the California-Washington Timber Company and now located in the boom of the Grays Harbor Boom Company and the Humptulips River to be delivered to the mill of the Aberdeen Lumber & Shingle Company commencing January 10th, 1927, or thereabouts and to be delivered as nearly as possible as the mill may require. . . .

"It is understood that the delivery of logs in accordance with this receipt is guaranteed by the Humptulips Logging Company of Aberdeen, Washington.

"California-Washington Timber Co.
By H. P. Brown.
"Humptulips Logging Company
By H. P. Brown, President."

It was later proven, and found by the court, that Brown had no authority whatever for and on behalf

of the Timber Company, for which he assumed to act, to have any control over the contract with the Logging Company, a resolution having been passed on March 3, 1920, by the directors of the Timber Company, denying him any authority over the contract relating to affairs with the Logging Company. In relation to the above matter, and respecting the receipt above set forth, the trial court made the following finding:

"The Humptulips Logging Company finished the logging and putting into the water of all of the timber covered by the contract of Mar. 1, 1920, sometime prior to Dec. 8, 1926, on which date it had in its boom in the Humptulips River and in the waters of that stream an estimated two million feet of saw logs, which under the contract, were the property of the California-Washington Timber Company. On that date, namely Dec. 8, 1926, H. B. Brown purported to represent both the California-Washington Timber Company and the Humptulips Logging Company, made a deal with the Aberdeen Lumber & Shingle Company to purchase these logs at the market price as fast as the logs could be gotten out and delivered, which would cover a period of several months, and Brown procured the Aberdeen Lumber & Shingle Company to make an advance payment of $20,000 on this two million feet of logs.

"While the check issued by the Aberdeen Lumber & Shingle Company for $20,000 advance was made payable to the order of the California-Washington Timber Company, it was immediately endorsed over by Brown, purporting to act for the California - Washington Timber Company, to the Humptulips Logging Company, no entry of the check being made on the books of the California-Washington Timber Company, but the check was entered in the books of the Humptulips Logging Company as a credit to the Aberdeen Lumber & Shingle Company as an advance on these logs. In this transaction Brown acted for both the California-Washington Timber Company and the Humptulips Logging Company. The advance was virtually a loan of $20,000 to the Humptulips Logging Company, or an advance from the Aberdeen Lumber & Shingle Com-

pany, the Humptulips Logging Company being at that time heavily in debt and in need of money. If the intent of the logging contract between the two companies of Mar. 1, 1920 had been carried out, this $20,000 would have been paid into the bank of Hayes & Hayes Bankers to the credit of the joint account of the companies and disbursed according to that contract, and out of it the California-Washington Timber Company would have received as the first money to be withdrawn its three dollars per M stumpage on the logs. As it was, the money was diverted and appropriated by Brown to the use and benefit of the Humptulips Logging Company, which was contrary to the contract, and which Brown had no authority from the California-Washington Timber Company to do. The California-Washington Timber Company never consented to this misappropriation of this payment.''

The Logging Company having been adjudged insolvent, a receiver was appointed for it on February 17, 1927. Between the time of the $20,000 advance, made by the Lumber & Shingle Company to the Timber Company on December 8, 1926, and the appointment of the receiver, the Logging Company had delivered to the Lumber & Shingle Company seven rafts, containing a total of 1,321,329 feet of logs, with a total sale price of $18,152.78., The Lumber & Shingle Company did not pay for these rafts in cash, but credited them against the $20,000 advance, which left $1,847.22 of the original advance for which no logs had been received. Such was the status of affairs, when the receiver of the Logging Company was appointed.

The receiver adopted the contract between the Logging Company and the Timber Company, and continued performance thereof. In March, 1927, he sold three rafts of logs, containing a total of 574,538 feet, the sale price of which aggregated $7,546.22, on which footage there was stumpage at three dollars per thousand due the Timber Company, amounting to

$1,723.61, leaving a balance in the hands of the receiver of the Logging Company of $5,822.61. From May to October, 1927, the receiver sold seven more rafts of logs, aggregating 440,548 feet, for which he received all the money, and of which the Timber Company was entitled to three dollars per thousand feet, amounting to $1,321.64.

When the receivership of the Logging Company was ready to be closed, appellant, as liquidator of Hayes & Hayes Bank, being the principal creditor of the insolvent Logging Company, bought all the remaining assets, including all choses in action, all rights in actions at law for damages for the concealment, preference, or misappropriation of any assets of the company, and all rights or benefits of any nature or description held or accruing to the corporation or to the receiver, for the sum of $18,300.

The court found that the receiver for the Logging Company, having recognized and adopted the contract with the Timber Company, had a first and prior claim on all the remaining saw logs for $5,129.04, representing its claim on stumpage for three dollars per thousand feet on the logs, and in liquidating and disposing of the remaining logs, which claim of the Timber Company was recognized by the receiver, and, from time to time thereafter during the receivership, as logs were brought to market and disposed of, distribution was made of the proceeds in that way, and the Timber Company, through the receiver, received and was paid its stumpage, the account between the Timber Company and the Logging Company, through the receiver, upon January and February log sales, showing the above stated amount due.

It was, therefore, concluded by the court, in the suit brought by the Timber Company against appellants, which was stipulated to be controlling in the other case,

that the Timber Company is entitled to judgment against appellants for the $3,821.16 on its general deposit account, with interest at six per cent on its respective amounts from the dates of declaring dividends Nos. 2, 3 and 4, and entitled to a judgment for $479.97 on the joint account, with interest at the legal rate on dividends Nos. 2, 3 and 4 from the dates they were declared, and entitled to judgment in the sum of $1,080.09 on the certificate of deposit account, with interest on the respective dividends from the times of declaring Nos. 2, 3 and 4, and judgment was entered accordingly.

 Appellants assert that the question is: Did the Timber Company become indebted to the receiver of the Logging Company, and, since the supervisor stands in the situation of the receiver, is the supervisor entitled to the offset of $5,129.04, under our long settled rule that, where two liabilities are owed by and through the same parties in the same right, they are properly the subject of offset and that the right of setoff is to be liberally construed.

Our last expression to that effect is cited in *Johnson v. Aberdeen,* 147 Wash. 482, 266 Pac. 707.

 Although asserting that the receiver adopted the contract in full, and that it was beneficial to him, appellants stoutly contend that the receiver had no right to pay any claims that may have arisen on the contract prior to the receivership.

To sustain the above contention, appellants cite cases involving leaseholds and defaulted rentals, existing prior to the appointment of a receiver.

There is a wide difference between such contracts and the contract in suit. A contract to pay rent at a stated future time creates no existing legal demand for the rent nor present indebtedness, until the stipulated time arrives. No indebtedness exists until that time. *Barkley v. Kerfoot,* 77 Wash. 556, 137 Pac. 1046.

But, when a receiver becomes possessed of premises belonging to an insolvent lessee or tenant, if he adopts the contract, or ratifies it, he becomes liable according to the terms of the contract. That is the effect of one of the cases cited by appellants, *DeWolf v. Royal Trust Co.*, 173 Ill. 435, 50 N. E. 1049. In that case the court said:

"Neither courts nor receivers have any right to disregard contracts or violate obligations."

And, further,

"The fact that a receiver can only enter into a contract as receiver with the sanction of the court, and that all persons are chargeable with notice, and deal with him at the risk of the court refusing its assent, has no effect to change the terms of a valid and binding contract made by the firm . . . and accepted by the receiver. In this case there is no contract made by the receiver, but the contract of leasing was made by the firm, and the leasehold interest was property of the firm."

There is nothing to the contrary in other cases cited by appellants: *Central Trust Co. v. Continental Trust Co. of City of New York*, 86 Fed. 517; *Dayton Hydraulic Co. v. Felsenthall*, 116 Fed. 961; *Barber Asphalt Co. v. Forty-Second St., M. & St. N. Avenue R. Co.*, 175 Fed. 154; *Mathews v. Butte Machinery Co.*, 286 Fed. 801; *Spencer v. World's Columbian Exposition*, 163 Ill. 117, 45 N. E. 250.

In this case, the Timber Company sold to the Lumber & Shingle Company the logs upon which the Lumber & Shingle Company advanced $20,000 on two million feet, board measure, log scale, of saw logs belonging to the Timber Company. As the trial judge very aptly said:

"The California-Washington Timber Company was entitled to have its money out of those logs. There was two million feet of logs. It did not make much

difference whether they took it out of the first rafts, or the last rafts, they were entitled to the three dollars a thousand. . . .

"The California-Washington Timber Company owned those logs and they took the three dollars a thousand . . . out of the last logs sold and could have taken it all out of the first logs, if they wanted to. I do not think they were bound by particular logs, they should take it out of, so long as they got it out of the two million feet, which was in the river."

We agree with that summing up. The Logging Company certainly was bound under the contract to furnish the two million feet of logs and the Timber Company was entitled to the three dollars a thousand feet out of any logs in the river. The receiver, having adopted the contract and assumed its performance, was also bound by its burdens to do the same things that the Logging Company would have been required to do. The logs sold by the Logging Company prior to the receivership had not all been paid for, and the balance due was merely a balance due on the entire quantity of logs.

Other matters are elaborately discussed by both parties in their briefs, but we consider the matter determined by what we have just said.

We conclude that the judgments of the trial court are right.

Affirmed.

TOLMAN, C. J., MITCHELL, MAIN, and PARKER, JJ., concur.